## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **Bullion Direct, Inc.** | ) | |
| 700 Lavaca Street LL1 | ) | |
| Austin, TX 78701 | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| **Hon. David J. Kappos,** | ) | |
| Under Secretary of Commerce for | ) | |
| Intellectual Property and Director of the | ) | |
| United States Patent and Trademark Office | ) | |
| P.O. Box 1567, Arlington, VA 22215 | ) | |
| Mason Building East, Room 10B20, | ) | |
| 600 Dulany Street, Alexandria, VA 22314 | ) | |

## COMPLAINT

Plaintiff Bullion Direct, Inc. ("Bullion Direct") alleges as follows:

### INTRODUCTION

1.      This is an action under 35 U.S.C. § 154(b)(4)(A) seeking that the patent term adjustment ("PTA") for U.S. Patent 7,584,135 titled, "System and Method for Electronic Trading and Delivery of a Commoditized Product" (the " '135 patent," attached as Exhibit A), be changed from 984 to 2464 days.  The United States Patent and Trademark Office ("PTO") made at least three errors in determining the amount of PTA for the '135 patent.

2.      First, the PTO did not apply 35 U.S.C. § 154(b)(2)(A) to the '135 patent in the manner required by *Wyeth v. Kappos*, 591 F.3d 1364 (Fed. Cir. 2010).

3.      Second, the PTO did not apply 35 U.S.C. § 154(b)(1)(A)(ii) correctly when it re-issued a final rejection including new grounds of rejection on October 6, 2008.

4.      Third, the PTO did not apply 35 U.S.C. § 154(b)(1)(B)(i) correctly after the patentee filed requests for continued examination.

1

PARTIES

5.      Plaintiff Bullion Direct is a corporation organized under the laws of the State of

Texas with its primary place of business at 700 Lavaca Street LL1, Austin, Texas, 78701.  As the

face of the '135 Patent indicates, Bullion Direct is the assignee of all rights and interest in the

'135 Patent.

6.      Defendant David J. Kappos (the "Director") is the Under Secretary of Commerce

for Intellectual Property and Director of the United States Patent and Trademark Office.  Under

35 U.S.C. § 3(a)(1), the powers and duties of the PTO are vested in the Director.

JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction under 5 U.S.C. §§ 701-06, 28 U.S.C.

§§ 1331, 1338(a), and 1361, and 35 U.S.C. § 154(b)(4)(A).

8.      Venue is proper in this District under 5 U.S.C. § 703 and 35 U.S.C.

§ 154(b)(4)(A).

9.      This Complaint is timely under 35 U.S.C. § 154(b)(4)(A).

PROSECUTION HISTORY OF THE '135 PATENT

10.      On May 17, 2001, inventors Charles Hadley McAllister and Vivek Katyal filed

U.S. patent application serial no. 09/860,134 with the PTO.

11.      On June 14, 2005, the PTO first responded under Section 132 of the Patent Act

when it mailed a non-final office action.

12.      On September 13, 2005, the applicants filed an amendment and reply to that non-

final office action.

13.      On December 19, 2005, the PTO responded to that amendment and reply by

mailing a non-final office action.

14.     On June 15, 2006, the applicants filed a reply to that non-final office action.

15.     On September 8, 2006, the PTO responded to that reply by mailing a final office action.

16.     On November 8, 2006, the applicants responded to that final office action by filing an amendment, response, and notice of appeal.

17.     On December 20, 2006, the PTO responded to that amendment, response, and notice of appeal by mailing an advisory action.

18.     On June 7, 2007, the applicants filed a request for continued examination under 35 U.S.C. § 132(b) ("RCE") and an amendment.

19.     On August 23, 2007, the PTO responded to that RCE and amendment by mailing a non-final office action.

20.     On January 11, 2008, the applicants filed an amendment and response to that non-final office action.

21.     On April 15, 2008, the PTO responded to that amendment and response by mailing a final office action rejecting the claims.

22.     On May 29, 2008, the applicants responded to that final office action by filing a response, without an amendment.  That response informed the PTO that the April 15, 2008, final office action relied upon a reference that was not prior art with respect to the application.

23.     The PTO did not respond to the May 29, 2008 response.

24.     Instead, on October 6, 2008, the PTO mailed a new final office action in response to the January 11, 2008, amendment and response.  The October 6, 2008, final office action stated grounds for rejection which were different from those stated in the May 29, 2008, final office action.

25.    On October 14, 2008, the applicants filed an RCE and an amendment.

26.    In the remarks accompanying their October 14, 2008, RCE and amendment, the applicant stated, "[t]he applicants believe that the examiner was obligated to formally withdraw the April 15, 2008 final rejection because the examiner has never issued an advisor action and because the examiner has issued a superseding final office action, and that the April 15, 2008, final rejection is inoperative.  Nevertheless, because the examiner has not formally withdrawn the April 15, 2008, final office action, the applicants file this request of continuing examination and petition for a 3-month extension of time to reply to the April 15, 2008 office action in  order to preserve their rights.  Applicants incorporate by reference their January 11 and Mary 29, 2008 submissions herein."

27.    On December 23, 2008, the PTO mailed a non-final office action in response to the October 14, 2008 RCE and amendment.

28.    On January 12, 2009, the applicants filed a response to that non-final office action.

29.    On March 2, 2009, the PTO responded to that response by mailing a notice of allowance and a determination that to date, the application was due 933 days of PTA.

30.    On April 20, 2009, the applicants filed a amendment under 37 C.F.R. § 1.312.

31.    On April 21, 2009, the PTO responded to that amendment by mailing a notice that that amendment had been entered.

32.    On May 21, 2009, the applicants paid the issue fee and submitted an application under 37 C.F.R. 1.705(b) requesting reconsideration of the PTO's determination of PTA.

33.    On August 3, 2009, the PTO mailed a decision granting in part and dismissing in part the applicant's application for reconsideration of the PTO's determination of PTA.  The letter stated that the PTA determination was currently 931 days.

34.    On September 1, 2009, the '135 patent issued from application serial no. 09/860,134.  As shown on the first page of the '135 patent, the amount of PTA was determined to be 984 days.  *See* Exhibit A.

35.    On October 20, 2009, the patentees submitted an application under 37 C.F.R. 1.705(d) requesting reconsideration of the PTO's determination of PTA.

36.    The PTO has not responded to this application.

37.    There was no terminal disclaimer filed during the prosecution of the '135 patent.

THE PTO'S DETERMINATION OF PTA FOR THE '135 PATENT

38.    35 U.S.C. § 154(b)(3)(B) requires the Director to determine PTA for the '135 Patent.

39.    The correct amount of PTA due the '135 Patent is described at 35 U.S.C. § 154(b) and is properly determined by:

(1)(A)  adding 1 day for each day after the end of periods specified in 35 U.S.C. § 154(b)(1)(A)(i), (ii), (iii), or (iv), as the case may be, until the action described in such clause is taken ("A Delay"), including the failure of the PTO to—

    (i)    provide at least one of the notifications under 35 U.S.C. § 132 or a notice of allowance under 35 U.S.C. § 151 not later than 14 months after the date on which the application was filed under 35 U.S.C. § 111(a), as stated in 35 U.S.C. § 154(b)(1)(A)(i) and 37 CFR §§ 1.702(a)(1) and 1.703(a)(1) ("14-Month A Delay");and

    (ii)   respond to a reply under section 132 within 4 months after the date on which the reply was filed, under 35 U.S.C. § 154(b)(1)(A)(ii) ("4-Month A Delay");

(1)(B)  adding 1 d ay for each day after the end of the 3-year period specified in 35 U.S.C. § 154(b)(1)(B) until the patent is issued ("B Delay");

(2)(A)  subtracting any limitation under 35 U.S.C. § 154(b)(2)(A), as interpreted by *Wyeth v. Kappos*, 591 F.3d 1364 (Fed. Cir. 2010) ("Overlap"); and

(2)(C)  subtracting  a period equal to the period of time during which the applicant failed to engage in reasonable efforts to conclude prosecution of the application, as described in 35 U.S.C. § 154(b)(2)(C)(ii) or in the regulations referred to in 35 U.S.C. § 154(b)(2)(C)(iii) ("Applicant Delay").

40.     Exhibit B is a printout of the PTO's determination of PTA for the '135 patent, as shown on the PAIR section of the PTO's website.

41.     The PTO determined the amount of 14-Month A Delay as 1063 days. *See* Ex. B. That determination was made as follows.  Because the PTO failed to provide a notification under 35 U.S.C. § 132 not later than 14 months after the application date (*i.e.*, not later than July 17, 2002), the PTO determined that the '135 Patent was due one day of PTA for each day after July 17, 2005, until such a notification was provided.  That notification was provided on June 14, 2005, which was 1063 days after the 14-month date.  Hence, the PTO determined that the '135 Patent was due 1063 days of 14-Month A Delay. *See* Ex. B.

42.     The PTO determined the amount of 4-Month A Delay as 7 days. *See* Ex. B.  That determination was made as follows.  Because the PTO failed to provide a notification under 35 U.S.C. § 132 not later than 4 months after the applicant's May 29, 2008, response (*i.e.*, not later than September 29, 2008), the PTO determined that the '135 Patent was due one day of PTA for each day after September 29, 2008, until such a notification was provided.  That notification was provided on October 6, 2008, which was 7 days after the 4-month date.  Hence, the PTO determined that the '135 Patent was due 7 days of 4-Month A Delay. *See* Ex. B.

43.     The PTO failed to separately determine B Delay and Overlap, but instead determined that there were 53 days of B Delay net of Overlap, using 37 CFR §§ 1.702(b), 1.703(b), and 1.703(f). *See* Ex. B.  Upon information and belief, the PTO performed that determination as follows.  Because the PTO failed to issue the '135 patent within 3 years of the

6

actual filing date in the U.S. (*i.e.*, by May 17, 2004), the PTO determined that the '135 Patent

was due one day of PTA for each day after May 17, 2007, until the earlier of either the day the

'135 Patent issued or the day before the applicant first filed an RCE, minus any Overlap.  The

applicants first filed an RCE on June 7, 2007, while the '135 Patent issued on September 1,

2009.  Thus upon information and belief, the amount of B Delay determined by the PTO would

be from May 18, 2004 through June 6, 2007, which is 1116 days, minus any Overlap.  Upon

information and belief, under the interpretation of Overlap in 69 Fed. Reg. 34283-84 (which

interpretation was held incorrect in the *Wyeth* case), the amount of overlap determined by the

PTO would be the lesser of the 14-Month A Delay (*i.e*, 1063 days), or the B Delay (*i.e.*, 1116

days), or 1063 days. (Upon information and belief, the PTO did not consider the 7 days of 4-

Month A Delay that it had determined, because that delay occurred after the applicant filed an

RCE.)  Thus, the amount of B Delay not of Overlap determined by the PTO is 1116 days, minus

1063 days, or 53 days.  *See* Ex. B.

     44.    The PTO determined the amount of Applicant Delay as 139 days. *See* Ex. B.

That determination was performed in three steps as follows.  First, because the Applicant took in

excess of 3 months to reply to the non-final office action mailed on December 19, 2005, the PTO

determined that Applicant Delay included the number of days beginning on the day after the date

that is three months after the date of mailing or transmission of the December 19, 2005 non-final

office action (*i.e.*, March 20, 2006) and ending on the date the reply was filed (*i.e.*, June 15,

2006), or 88 days.  *See* 37 C.F.R. § 1.704(b).  Second, because the Applicant took in excess of 3

months to reply to the non-final office action mailed on August 27, 2007, the PTO determined

that Applicant Delay included the number of days beginning on the day after the date that is

three months after the date of mailing or transmission of the August 23, 2007 non-final office

action (*i.e.*, November 24, 2007) and ending on the date the reply was filed (*i.e.*, January 11,

2008), or 49 days. *See* 37 C.F.R. § 1.704(b). Third, because the Applicant submitted an

amendment under 35 U.S.C. § 312 on April 20, 2009, the PTO determined that Applicant Delay

included the number of days beginning on the day that amendment was filed; (*i.e.*, April 20,

2009) and ending on the mailing date the notice in response to the amendment (*i.e.*, April 21,

2008), or 2 days. *See* 37 C.F.R. § 1.704(c)(10). Thus, the amount of Applicant Delay

determined by the PTO was 88 days, plus 49 days, plus 2 days, or 139 days. *See* Ex. B.

45.     Thus the amount of PTA determined by the PTO for the '135 patent was:

(1)(A)  adding all A Delay, namely,

      (i)     adding 1063 days of 14-Month A Delay;

      (ii)    adding 7 days of 4-Month A Delay;

(1)(B) & (2) (A)  adding 53 days, which is the net of B Delay and Overlap; and

(2)(C) subtracting 139 d ays of Applicant Delay;

for a net total of 984 days. *See* Ex. B.

COUNT I
**Award of an Additional 670 Days of Patent Term Adjustment
for the '135 Patent Applying the Method Described in *Wyeth v. Kappos***

46.     All previous paragraphs are incorporated into this claim for relief.

47.     The PTO erred by failing to apply the method described in *Wyeth v. Kappos*, 591

F.3d 1364 (Fed. Cir. 2010), in determining Overlap for the '135 patent.

48.     Except as noted in Count 3, the amount of Overlap is correctly determined using

the method described in *Wyeth* is as follows. The period of 14-Month A Delay is from July 18,

2002, to June 14, 2005. The period of B Delay is from May 18, 2004, to June 6, 2007. The

Overlap consists of calendar days which are included as both A Delay and B Delay (*i.e.*, May 18, 2004, to June 14, 2005), or 393 days.

49.     The amount of PTA which would be due the '135 Patent had the PTO correctly applied the method described in *Wyeth* in determining Overlap, as described at 35 U.S.C. § 154(b)(2)(A), is:

(1)(A)  adding all A Delay, namely,

(i)     adding 1063 days of 14-Month A Delay;

(ii)    adding 7 days of 4-Month A Delay;

(1)(B)  adding 1116 days of B Delay;

(2)(A)  subtracting 393 days of Overlap; and

(2)(C)  subtracting 139 days of Applicant Delay;

for a net total of 1654 days, which is 670 days more than the PTO's determination.

50.     The failure of the PTO to correctly apply the method described in *Wyeth* when calculating Overlap for the '135 Patent, and the award of 984 days of PTA instead of at least 1654 days, was arbitrary, capricious, an abuse of discretion, not according to law, and in excess of the Director's statutory authority.

COUNT II
**Award of an Additional 141 Days of Patent Term Adjustment
for the '135 Patent Applying 35 U.S.C. § 154(b)(1)(A)(ii) and 37 C.F.R. § 1.703(a)(2)**

51.     All previous paragraphs are incorporated into this claim for relief.

52.     The PTO erred by failing to correctly apply 35 U.S.C. § 154(b)(1)(A)(ii) and 37 C.F.R. §§ 1.702(a)(2) and 1.703(a)(2) in determining that the 4-Month A Delay for the '135 patent was 7 days.  In fact, the 4-Month A Delay is 148 days.

53.     After the applicants filed an amendment and response on January 11, 2008, the PTO responded to that amendment and response by mailing a final office action on April 15,

2008.  The April 15, 2008, final office action rejected every claim under 35 U.S.C. § 103(a) as being unpatentably obvious over the Bogosian reference in view of the Swartz reference.  After the applicants pointed out in their May 29, 2008, response that the Swartz reference was not prior art, the PTO mailed a new final rejection in responsive to the applicants' January 11, 2008, amendment and reply.  The new final rejection, mailed on October 6, 2008, provided different reasons for rejection of the January 11, 2008 amendment.

54.      The May 29, 2009, final office action did not constitute one of the notifications under 35 U.S.C. § 132 because it did not "stat[e] the reasons for [the] rejection" of the claims, and because it did not provide "such information . . . as may be useful in judging of the propriety of continuing the prosecution of [the applicants'] application" (*i.e.*, it did not state the PTO's additional reasons for rejection which were later revealed to the applicants in the October 6, 2008, final office action).

55.      Instead of determining the amount of 4-Month A Delay under 35 U.S.C. § 154(b)(1)(A)(ii) and 37 C.F.R. §§ 1.702(a)(2) and 1.703(a)(2) by determining that the October 6, 2008 revised final office action was filed 4 months and 7 days after the applicants' May 29, 2008, response, the PTO should have instead made that determination as follows.  Because the PTO failed to provide a notification under 35 U.S.C. § 132 not later than 4 months after the applicant's January 11, 2008 amendment and response (*i.e.*, not later than May 11, 2008), the '135 Patent is due one day of PTA for each day after May 11, 2008, until such a notification was provided.  As discussed above, that notification was not provided until October 6, 2008, which was 148 days after the 4-month date.  Hence, the '135 Patent is due 148 days of 4-Month A Delay.

56.     The amount of PTA which would be due the '135 Patent had the PTO correctly applied 35 U.S.C. § 154(b)(1)(A)(ii) and 37 C.F.R. §§ 1.702(a)(2) and 1.703(a)(2) in determining that the 4-Month A Delay is:

(1)(A)  adding all A Delay, namely,

      (i)     adding 1063 days of 14-Month A Delay;

      (ii)    adding 148 days of 4-Month A Delay;

(1)(B)  adding 1116 d ays of B Delay;

(2)(A)  subtracting 393 days of Overlap; and

(2)(C)  subtracting 139 d ays of Applicant Delay;

for a net total of 1795 days, which is an additional 141 days more than the determination in Count 1.

57.     The failure of the PTO to correctly apply 35 U.S.C. § 154(b)(1)(A)(ii) and 37 C.F.R. §§ 1.702(a)(2) and 1.703(a)(2) in determining that the 4-Month A Delay for the '135 Patent, and the award of 984 days of patent term adjustment for the '135 Patent, instead of at least 1795 days, was arbitrary, capricious, an abuse of discretion, not according to law, and in excess of the Director's statutory authority.

COUNT III
**Award of an Additional 669 Days of Patent Term Adjustment
for the '135 Patent Applying 35 U.S.C. § 154(b)(1)(B)(i)**

58.     All previous paragraphs are incorporated into this claim for relief.

59.     The PTO erred by failing to correctly apply 35 U.S.C. § 154(b)(1)(B)(i) after the applicant filed an RCE in determining that the B Delay for the '135 patent was 1116 days.  In fact, the B Delay is 1933 days.  Consequently, the PTO also erred by failing to determining the Overlap as 541 days.

60.     35 U.S.C. § 154(b)(1)(B) states:

(B)     Guarantee of no more than 3-year application pendency.— Subject to the
limitations under paragraph (2), if the issue of an original patent is delayed due to
the failure of the United States Patent and Trademark Office to issue a patent
within 3 years after the actual filing date of the application in the United States,
not including—

    (i)    any time consumed by continued examination of the application
requested by the applicant under section 132(b);

    (ii)    . . . ; or

    (iii)    . . . ,

the term of the patent shall be extended 1 day for each day after the end of that 3-
year period until the patent is issued.

61.     The plain language of 35 U.S.C. § 154(b)(1)(B) sets up a "trigger" which denotes

when B Delay applies, and a "remedy" of how much B Delay PTA will be granted if B Delay

applies.

62.     The "trigger" consists of the first phrase of 35 U.S.C. § 154(b)(1)(B) (up to the

second dash), and the three exclusions denoted (i), (ii), and (iii). Only exclusion (i) is applicable

in this case. The "trigger" states that when determining if the PTO issued a patent within 3

years, one does not count any time consumed by an RCE.

63.     In the case of the '135 patent, the "trigger" condition is satisfied. Even excluding

the entire period after the applicants filed an RCE on June 7, 2007, the PTO still took more than

3 years to issue the '135 patent. In fact, that 3-year period ended on May 17, 2004, which was

before the first office action.

64.     Having satisfied the "trigger" condition, the "remedy" portion of the statute

governs the amount of B Delay PTA to be awarded. The "remedy" portion is the flush language

which follows 35 U.S.C. § 154(b)(1)(B)(iii) (*i.e.*, "the term of the patent shall be extended 1 day

for each day after the end of that 3-year period until the patent is issued").

65.     The amount of B Delay PTA to be awarded to the '135 patent is 1 day for each day after the end of that 3-year period (*i.e.*, after May 17, 2004) until the patent was issued (*i.e.*, September 1, 2009), or 1933 days.

66.     The PTO's interpretation of 35 U.S.C. § 154(b)(1)(B)(i) is manifested at 37 C.F.R. §§ 1.702(b)(1) and 1.703(b)(1).  In accordance with 37 C.F.R. 1.703(b)(1), the PTO failed to attribute any B Delay to the '135 patent for the period beginning on the date on which the applicants filed an RCE and ending on the date the '135 patent issued.  In effect, under the PTO's rules, the filing of an RCE cuts off any future B Delay.

67.     The PTO's interpretation of 35 U.S.C. § 154(b)(1)(B)(i), as articulated in 37 C.F.R. §§ 1.702(b)(1) and 1.703(b)(1), is contrary to the plain language of that statute.  Instead of applying the exception of 35 U.S.C. § 154(b)(1)(B)(i) (concerning RCEs) to the "trigger" portion of the statute, as required by the plain language of that statue, these regulations mistakenly apply the exception of 35 U.S.C. § 154(b)(1)(B)(i) to the "remedy" portion. Correctly interpreted, the plain language of 35 U.S.C. § 154(b)(1)(B) makes the filing of an RCE only relevant to whether or not B Delay is triggered, and not to how long the term of the patent is adjusted once B Delay is triggered.

68.     When determining the correct B Delay of 1933 days, the amount of Overlap changes.  The amount of Overlap is correctly determined using the method described in *Wyeth* is as follows.  The period of 14-Month A Delay is from July 18, 2002, to June 14, 2005.  The period of 4-Month A Delay is from January 12, 2008, to October 6, 2008.  The period of B Delay is from May 18, 2004, to September 1, 2009.  The Overlap consists of calendar days which are included as both A Delay and B Delay (*i.e.*, May 18, 2004, to June 14, 2005, or 393 days, and

January 12, 2008, to October 6, 2008, or 148 days).  Thus, the total Overlap is 393 days plus 148 days or 541 days.

69.    Alternatively, 37 C.F.R. §§ 1.702(b)(1) and 1.703(b)(1) are contrary to the plain language of the statute, because they exclude all periods following the filing of an RCE from B Delay, rather than merely "any time consumed by continued examination of the application."  35 U.S.C. § 154(b)(1)(B)(i).  After an RCE is filed, only a portion of the time is consumed by continued examination; other portions are consumed, for example, by the applicant or by the PTO's administrative functions other than examination.

70.    In addition to Counts 1 and 2, the amount of PTA which would be due the '135 Patent had the PTO correctly applied 35 U.S.C. § 154(b)(1)(B)(i) after the applicant filed an RCE is:

(1)(A)  adding 1211 days of A Delay, consisting of:

      (i)      1063 days of 14-Month A Delay and

      (ii)     148 days of 4-Month A Delay;

(1)(B)  adding 1933 d ays of B Delay;

(2)(A)  subtracting 541 days of Overlap; and

(2)(C)  subtracting 139 d ays of Applicant Delay;

for a net total of 2464 days, which is an additional 669 days more than the determination in Count 2.

71.    The PTO's use of 37 C.F.R. §§ 1.702(b)(1) and 1.703(b)(1) in determining that the B Delay for the '135 Patent, and the failure to determine at least 2464 days of B Delay, was arbitrary, capricious, an abuse of discretion, not according to law, and in excess of the Director's statutory authority.  Alternatively, the PTO's use of 37 C.F.R. §§ 1.702(b)(1) and 1.703(b)(1) in determining that the B Delay for the '135 Patent, and the failure to determine the time consumed

by continued examination, was arbitrary, capricious, an abuse of discretion, not according to law, and in excess of the Director's statutory authority.

<u>RELIEF SOUGHT</u>

72.    Bullion Direct seeks:

(a)    judgment that the correct period of patent term adjustment for the '135 Patent is 2464 days;

(b)    an order compelling the Director to change the amount of patent term adjustment for the '135 Patent from 984 to 2464 days; and

(c)    such other relief as is just and proper.

Dated:  February 26, 2010

Respectfully submitted,

Craig G. Falls (D.C. Bar No. 502368)
Dechert LLP
1775 I Street, NW
Washington, DC  20006-2401
craig.falls@dechert.com
(202) 261-3373
*Attorney for Plaintiff*

Robert W. Ashbrook, Jr.
Dechert LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA  19104-2808
(215) 994-2215
*Of Counsel*

13720626.3

# EXHIBIT A



US007584135B1

(12) **United States Patent**     (10) **Patent No.:**   **US 7,584,135 B1**
McAllister et al.     (45) **Date of Patent:**     **Sep. 1, 2009**

(54) **SYSTEM AND METHOD FOR ELECTRONIC TRADING AND DELIVERY OF A COMMODITIZED PRODUCT**

(75) Inventors: **Charles Hadley McAllister**, Wimberley, TX (US); **Vivek Katyal**, Austin, TX (US)

(73) Assignee: **Bullion Direct, Inc.**, Austin, TX (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 984 days.

(21) Appl. No.: **09/860,134**

(22) Filed: **May 17, 2001**

**Related U.S. Application Data**

(60) Provisional application No. 60/204,650, filed on May 17, 2000.

(51) **Int. Cl.**
    *G06Q 40/00*     (2006.01)
(52) **U.S. Cl.** ............................. **705/37**; 705/38; 705/36; 705/35
(58) **Field of Classification Search** ................. 382/139, 382/151; 705/35–38, 34; 704/354; 707/200; 235/472
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,717,989 A | | 2/1998 | Tozzoli et al. |
| 5,794,210 A | * | 8/1998 | Goldhaber et al. ............ 705/14 |
| 5,826,241 A | | 10/1998 | Stein et al. |

| | | | |
|---|---|---|---|
| 5,913,202 A | | 6/1999 | Motoyama |
| 5,950,176 A | | 9/1999 | Keiser et al. |
| 5,963,923 A | | 10/1999 | Garber |
| 6,014,643 A | * | 1/2000 | Minton .................... 705/36 R |
| 6,131,087 A | | 10/2000 | Luke et al. |
| 6,236,980 B1 | * | 5/2001 | Reese ........................ 705/36 R |
| 6,418,419 B1 | * | 7/2002 | Nieboer et al. .............. 705/37 |
| 6,760,470 B1 | * | 7/2004 | Bogosian et al. ......... 382/139 |
| 2003/0132298 A1 | * | 7/2003 | Swartz et al. .......... 235/472.02 |

OTHER PUBLICATIONS

Capobianco Named President of Prebon Commodities PR Newswire. New York: Mar. 4, 1998. p. 1.*
Bullion Direct, http://www.bulliondirect.com/aboutus.do, Jun. 7, 2007.

* cited by examiner

*Primary Examiner*—Frantzy Poinvil
*Assistant Examiner*—Clement Graham
(74) *Attorney, Agent, or Firm*—Dechert LLP

(57)     **ABSTRACT**

The present invention provides a system and method for trading of a commoditized product through a distributed network of computers, and for delivering the commoditized products after the trade. The system includes an order matching routine, a payment routine, a product qualification routine, and a distribution routine. The invention provides for secure electronic trading of a commoditized product through a hub centric platform that provides for a real order exchange in a real time environment, allows individual buyers and sellers to remain anonymous to each other, eliminates size or volume as a means of discrimination for transaction, and maximizes distribution efficiency.

**26 Claims, 21 Drawing Sheets**





*FIGURE 1*



*FIGURE 2*



*FIGURE 3*



*FIGURE 4*



*FIGURE 5*



FIGURE 6



*FIGURE 7*



*FIGURE 8*



*FIGURE 9*



*FIGURE 10*



*FIGURE 11*



*FIGURE 12*



*FIGURE 13*



*FIGURE 14*



*FIGURE 15*



*FIGURE 16*



FIGURE 17



*FIGURE 18*



**FIGURE 19**



*FIGURE 20*



*FIGURE 21*

US 7,584,135 B1

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# SYSTEM AND METHOD FOR ELECTRONIC TRADING AND DELIVERY OF A COMMODITIZED PRODUCT

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims the benefit under 35 U.S.C. §119 (e) to provisional application No. 60/204,650, filed May 17, 2000.

## TECHNICAL FIELD

This invention relates generally to the field of electronic trading and, more particularly, to providing secure electronic trading of a commoditized product through a hub centric platform that provides for a real order exchange in a real time environment, allows individual buyers and sellers to remain anonymous to each other, eliminates size or volume as a means of discrimination for transaction, qualifies products, and maximizes distribution efficiency.

## BACKGROUND OF THE INVENTION

Establishing a buyer seller relationship is an essential step in commerce. The seller can attract buyers through advertising, direct solicitation, or through the sales activities of brokers and buyers. Currently, sellers can solicit buyers through traditional methods such as media advertising, and face to face selling, or they can utilize the relatively new technology of e-commerce by advertising on the Internet. Once interested buyers are attracted, transactions can proceed to closure in many ways.

Establishing a buyer seller relationship in traditional ways may result in a contract which then requires execution. The seller must provide the product, and the buyer must pay for the product. If the buyer and seller are in two different locations, a number of other issues are raised. For example, the credibility of each party, the authenticity and qualification of the product, the terms under which the buyer must take possession, the way in which the product will be shipped, who will pay for shipping and handling, and the mode of payment, all become major issues with which both parties must deal. Often buyers and sellers utilize a funding agent and establish a letter of credit for transfer of funds on products that must be shipped. This is costly and usually only available to sellers and buyers of substantial size, and for orders of significant volume. Carloads of grain may be sold in this manner, however, it would not be cost effective to use such a system for one gold coin.

Currently, buyers and sellers may use the Internet for establishing relationships. Current means for trading on the internet include order matching, catalogue sales, and auctions. Order matching is used most effectively for financial products, such as, for instance, stocks, bonds, and futures. These current systems may generate information or conduct a trade, however, the fulfillment of the transaction is purely electronic and doesn't involve the physical transfer of the item being traded. The price is tied to a limited access market, such as the New York Stock Exchange, or Chicago Board of Trade. These markets are market focused, not product focused. Price is determined based on the trades in the market.

In traditional order matching systems, and customers typically do not have access to true market pricing. The channels to view, place, and execute orders are tightly controlled by large players (i.e. institutions). Traditional commodities markets, such as the New York Mercantile Exchange (NYMEX),

allow only limited access and are open only during certain times of the day. Actual commoditized products are not typically traded. Instead, large paper contracts for future delivery of bulk commodities are the focus of these markets. For example, a typical platinum contract is for future delivery of 50 ounces of platinum at a total value of approximately $30,000 each. These contracts are not feasible for purchase and delivery by small investors due to their high value, lack of fractional distribution, as well as the fact that the contracts themselves are impossible to hold over an extended period of time as they are set to expire. In fact, the primary purpose of the traditional commodities exchange is to facilitate hedges for large players in a particular industry in which physical delivery is not normally made.

In other related market services, pricing for product is derived from the most actively traded contract month. In the traditional market, this has become the standard because the largest players of an industry, who control the distribution channel, use paper contracts for hedging purposes when conducting their large trades. Therefore, pricing for the actual products is not true or real as pricing is not in a real time environment and doesn't directly represent the true voice of the consumer or end user of product. For example, a large supplier of American Gold Eagles one ounce coins might sell only 100 ounce lots at a price that is based on the most actively traded month for a futures contract on the New York Commodities Exchange (COMEX). The broker that is reselling from the 100 ounce lots might sell 20 ounces at a time to retail jewelry or coin stores and will price product in the same manner. The broker will likely include an additional premium or commission for transaction costs and profit margin. The retail jewelry or coin store might resell one at a time to individual investors in the same manner. The total transaction cost ultimately paid by the end customer can be substantial considering that each market participant in the distribution chain also allows for a market risk factor in case the contract price of gold (100 ounces) has dropped. The price of the product might change due to price of the paper futures contract changing even though the actual supply and demand of the product has not changed. This practice doesn't allow for true market pricing of each individual commoditized product as dictated by real buyers and sellers.

Due to controlled (or lack of) access to markets, current trading platforms give advantage to large volume buyers and small buyers must pay a premium price due to brokerage fees and minimum trade sizes. Additionally, large volume orders are matched with similar volumes, and it is not advantageous for large sellers to have an order filled by many small buyers, because they must transact many contracts and pay for many shipments. Brokers may combine incoming trades from small buyers or sellers and conduct one transaction to fulfill his obligation, however, the broker does not represent both parties to a transaction. In fact, it is common practice for brokers to actually buy at one price, sell to their customer at a higher price, and collect a commission from their customer, all at the same time. This practice is commonly referred to as "making or playing the spread". In such a case, the end buyer or seller obviously has no true voice in the marketplace.

Catalogues provide buyers with many choices of products to purchase with a set asking price. The asking price includes margins. As the price of the product fluctuates, the asking price must be updated by the seller, sometimes on a frequent basis. On some sophisticated catalogues, pricing might be tied to a certain suppliers price schedule or even to a futures exchange. For example, one online catalogue for precious metals products is linked to the NYMEX and COMEX futures contract exchange for pricing. Once an order is placed

US 7,584,135 B1

3

on the catalogue, the order still has to be fulfilled with the actual product sold, which is unavailable on the exchange. This form of pricing is not accurate and does not ensure efficient or accurate pricing and is not automatically fulfilled. Current catalogue systems are not integrated with an order matching system and therefore do not benefit from real time pricing with immediate order fulfillment. The fulfillment and shipping requires a series of steps to completion.

Auctions are another means of trading on the internet. Sellers list products and buyers bid on the price they want to pay for the product. Auctions are time defined because the product is offered for a set amount of time and is matched to the highest offer at the expiration of the auction. In addition, the underlying value of the product might be fluctuating during that time-frame. A bid placed on the initial offer date may not be a fair price one week later for some goods, such as precious metals, coins, and gemstones. In addition, auctions do not provide for combining orders. Even though there may be several buyers, only one gets the item because buyers are pit against each other. Pricing is determined by the bidding, not the real time value of the item. In an auction format, the buyers and sellers must deal directly with each other, are often known, and share the risk of the transaction. Furthermore, it is difficult and time consuming to buy from or sell to a large number of parties at the same time.

For commoditized products, the current systems available for commerce do not provide for distribution efficiency, do not allow small players to participate equally, and do not provide a real time pricing based on real time supply and demand principals. Thus there is a need in the art for a system and method for providing secure trading, qualification, and delivery of a commoditized product. There is a further need for providing individual buyers and sellers with an anonymous, non-discriminatory means to exchange product without the burden of authenticating transaction elements and details including buyer/seller qualifications, product qualification, payment, and order fulfillment. There is a further need for a commodities market that is accessible and open 24 hours daily, seven days a week and 365 days a year. There is also a need for automatic price determination and automatic price matching that is not limited by market makers or by uneven buyer to seller units. And further there is a need for efficient distribution of commoditized products. Also, there is a need for buyers to be able to purchase from more than one seller at a time and receive delivery, if they so choose, at one time with one shipment, and the ability to pay one source. There is also a need for a seller to be able to efficiently sell to more than one buyer at a time, and be able to ship one package to one source, if they so choose, and receive a payment from one source. There is also a need for a secure payment method by which seller can receive payment prior to delivering product.

SUMMARY OF THE INVENTION

The foregoing needs of the market are met by a method and system for the secure electronic trading of a commoditized product. In one aspect, the system and method provides for order matching that is not auction based, and provides real time pricing via real orders on a hub centric platform that is product focused rather than market focused. All trades are guaranteed on the buy and sell, products are authenticated, and all players participate equally regardless of size. The price is automatically adjusted for the market, and the system is available 24 hours daily 365 days a year. The market of the invention is a continuous market that has the ability to move in real time on a seconds notice based on real orders, not

4

limited to a market-maker's bid and ask. The system provides access to real orders that the customer can execute against and no one really controls the channel to execution of the order. This is a real order exchange in a real time environment. A small player has just as much opportunity to get the next competitive price as a large order that might be priced behind them.

Trading efficiency is apparent because an individual buyer that wants to conduct ten different trades or buy ten different units of a product, has the ability to match orders against ten different parties of a platform to have the advantage of dealing with only one transaction, the transaction with the hub. The orders will be matched with the 10 most competitive offers, without shopping in several different locations. A seller who would not normally entertain a transaction with a small player is now selling to several small buyers in one transaction. The hub centric model levels the playing field and opens up channels of trade previously not profitable. The seller does not have to ship the product to 10 different buyers, or open ten different accounts.

Buyers do not have to search for and qualify each potential seller. Buyers now have the capability of accumulating any number of orders that match with any number of sellers without the burden of establishing an equal number of relationships. Now, only one relationship would need to be established and maintained with the hub. Distribution efficiency is attained by shipping several different orders through one shipment. For example, a builder purchases 3 windows, 25 nuts, 25 bolts and 15 4 by 8 sheets of plywood, and 4 pallets of roofing shingles resulting from orders matched to 20 different sellers. All can be shipped in one shipment. The same is true for a buyer purchasing 25 gold coins at $270.00 per ounce, where there were 2 different sellers, one selling 20 coins and one selling 5 coins. In both cases of the builder and the coin purchaser, one transaction was implemented and one shipment is sent at a dramatic decrease of transaction costs to all parties involved.

Sellers do not have to advertise to establish new relationships and they have the ability to view all these orders in the market and decide if they want to place a matching order or place another order in the market. It is possible to know the depth of the market for each product and neither the buyer or seller need to assume the risk of credibility of the other party in the transaction because it is assumed by the hub. In addition, sellers remain anonymous to other members. For example, a seller now has the ability to place one order for 1000 ⅒ ounce American Gold Eagle coins valued at $30 each. The order might match with 1000 different buyers in 1000 different locations. The seller would be able to send one shipment to the hub at a cost of approximately $25.00 and receive one payment from the hub for $30,000 less a small clearing fee. Obviously, this ability to efficiently access the market would dramatically decrease their transaction cost.

The hub centric system provides for a process to qualify buyers and sellers using uniform standards. Once a new customer has opened an account, a process for qualifying and then authorizing the customer is initiated. This process includes, but is not limited to verify financial standing and market position. A trading power is defined based on this and other relevant information. The customer is then free to transact business with the hub within the parameters set on their account.

The hub also provides a process for the qualification of product, including but not limited to authentication and verification. Once incoming product is received at the hub, the product is verified to meet the specifications of the matching order. The product can also be inspected or authenticated

US 7,584,135 B1

5

using best practices for the particular industry. This process ensures that the 1000 matching buyers for the product receive verified and authenticated for themselves. For example, when a seller ships in 1000 1/10 ounce American Gold Eagle coins, the hub qualifies the product which includes, but is not limited to, counting, weighing, inspecting and authenticating the gold coins. The authentication process includes, but is not limited to, examining color, measuring size, displacement, and weight. Advanced technology might be used to determine metal content.

The hub provides a way for payments to be distributed securely to customers by using a system involving, but not limited to, clearing accounts, banking processes, and for some payment types, a special account structure with predefined restrictions. One such payment type provides a secure way to pay seller prior to product delivery. When a seller has executed orders on the hub trading system, they can opt for payment prior to shipping product to the hub. Upon request, a prior pay payment is sent from a special account that has restrictions based on the prior pay contract. The customer may deposit payment into their bank account prior to sending product. Once product is received and qualified, the restrictions on payment are automatically released through an automatic process involving software but can also be done by a manual process. This form of payment gives the seller a binding payment instrument and therein provides an extraordinary level of security for the seller before releasing product from their possession. As an auxiliary service, the hub also provides the packaging material for the shipment along with a prepaid shipping label. Insurance is also provided on return package.

In other aspects, further services can be offered from sub-hubs that link to the hub centric model. For instance, when catalogue sales are tied to the hub centric model or one of the sub hubs, the price is constantly updated from the link to the market for that specific product and the margin is built in or defined by the catalog operator. Therefore, it isn't necessary to manually update the catalogue inventory at specific intervals because it is done every time the market price changes. Furthermore, a catalog order can now be immediately fulfilled by initiating an immediate market order for the exact product sold. This system would allow for continuous real time pricing and fulfillment of catalog orders 24 hours daily, 7 days a week, 365 days a year.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a functional block diagram illustrating the system architecture of an exemplary aspect of the present invention.

FIG. 2 is a flowchart illustrating an exemplary aspect of an account opening routine.

FIG. 3 is a flowchart illustrating a second method implemented by an exemplary aspect of the present invention.

FIG. 4 is a flowchart illustrating a third method of an exemplary aspect of the present invention.

FIG. 5 is a functional block diagram illustrating a revenue model implemented by an exemplary aspect of the present invention.

FIG. 6 is a flow chart illustrating the authorization of new accounts.

FIG. 7 is a functional block diagram illustrating an exemplary aspect of a buy order.

FIG. 8 is a functional block diagram illustrating an exemplary aspect of a sell order

FIG. 9 is a functional block diagram illustrating an accounts payable routine.

6

FIG. 10 is a functional block diagram illustrating the prior pay routine.

FIG. 11 is a functional block diagram illustrating an exemplary aspect of shipping selection.

FIG. 12 is a functional block diagram illustrating an exemplary aspect of distribution.

FIG. 13 is a functional block diagram illustrating an exemplary aspect of distribution.

FIG. 14 is a functional block diagram illustrating an exemplary aspect of distribution.

FIG. 15 is a flow chart demonstrating the prior pay bank routine.

FIG. 16 is a flow chart demonstrating draw options.

FIG. 17 is a flow chart demonstrating pending trades.

FIG. 18 is a flow chart demonstrating a receivables routine.

FIG. 19 is a flow chart demonstrating the qualification of product.

FIG. 20 is a flow chart demonstrating an accounts receivable routine.

FIG. 21 is a continuation of the functional block diagram in FIG. 7.

DETAILED DESCRIPTION OF THE INVENTION

The present invention comprises a hub centric platform which has the capability to accept orders, match orders, organize and manage portfolios; qualify buyers, sellers, and products; distribute products and payments; and accept products and payments. All activities are conducted through the hub, which eliminates the need for individual buyers and sellers to interact. Orders are matched without discrimination based upon the size or volume of the order.

For purposes of the invention, the following definitions apply.

A "customer" can be either a buyer or a seller. The term "member" is interchangeable with any of these terms.

A "seller" can be anyone wishing to sell a commoditized product. This includes individuals, buyers, distributors, manufacturers, farmers, cooperative sales organizations, warehouses and the like.

A "buyer" can be anyone wishing to purchase a commoditized product, including individuals, buyers, distributors, manufacturers, farmers, cooperative sales organizations, warehouses and the like.

A "commoditized product" includes any product or service that has standardized specifications, such as size, weight, color, and quality.

A "commodity" is any commoditized product.

"Nucleo" refers to the entire hub centric system.

The hub centric platform can be a software system, or a manual system. The various functions can be linked by computer systems, telecommunication systems, or any means to quickly and efficiently carry out the assigned task. Advantageously, the platform can be a computer network linked and operated by software designed for specific functions.

The commoditized products traded through the hub centric system include any product that has standardized specifications including but not limited to, size, weight, color and quality. Commoditized products can include farm products, building products, precious metals, and non-specialized services such as shipping, and the like.

A qualification program can be carried out manually, or utilizing any state of the art automatic technology. Qualification programs include inspection and authentication of product, certification of credit worthiness of participants in the system, including but not limited to buyers, sellers, and manufacturers.

US 7,584,135 B1

7

Buyers and sellers, or customers of the system include but are not limited to individual consumers, manufacturers, resource management entities, financial institutions, brokerages, mining facilities, cooperative sales organizations, and industry organizations.

For purposes of explanation, the trading of a precious metal, such as gold bullion is used. FIG. 1 illustrates a functional block diagram illustrating the system architecture of an exemplary aspect of the trading system comprising a hub centric platform. The system comprises buyer sites 102 and seller sites 104 which can be any electronic source including but not limited to a home computer, a broker access means, a direct line from a manufacturer, individual or institution, or any means of telecommunication.

A server 106 which may be associated with the buyer site 102 or the seller site 104 connects to a distributed network of computers 108, such as the Internet. The distributed computer network 108 connects to the order matching routine 116 of the hub centric platform through an Internet website interface 118 or similar type interface between the server 106 and the Internet 108.

The hub centric platform, or Nucleo system 100 links an individual investor to a data base management system of the platform, where orders are accumulated, managed, and qualified. An order matching routine 116 running on the Internet server 106 matches a seller order with corresponding matching buy orders. Several buy orders may be necessary to match one sell order and this is performed automatically by the matching routine. Quality, quantity, and other commoditized product characteristics will also be matched by the order matching routine 116. The Internet website interface 118 permits a user to obtain information from and to communicate with the order matching routine 116. The order matching routine 116 can provide a user with up-to-date account information, real time market information, and a variety of market command options. The market trade specifications are continually provided to the order matching routine 116, enabling a buyer or seller to continually check the current price for the product.

The database management system maintains portfolios for buyers 124 and sellers 120. The database management system debits and credits the portfolios for each trade. Portfolios can be customer accounts which the buyer or seller maintains with the hub centric platform or any secured financial facility including but not limited to banks, credit unions, brokerage accounts or industry specified facility.

New customers access the system as explained in FIG. 2. The buyer or seller logs onto a new account page and enters requested information. A user identification and password are established. The Buyer or seller must log in for the first time. New customers are limited on first time trades until their credit information has been established.

Established customers log into the site and can obtain information as shown in FIG. 3. Information on current trading power, and outstanding products and payments due are provided. In order to place orders, the customer must accept contractual terms before proceeding. Customers can view pending trades, review portfolios, post new orders, or draw from the current account. If the customer elects to place a new order (FIG. 4), the system determines if the customer is new or approved. FIG. 5 demonstrates the trade process where the seller or buyer places a trade. The order specifications are advanced to the order matching platform and confirmation of the trade is sent to the customer. FIG. 6 demonstrates the process for qualifying the customer account. FIG. 7 demonstrates an exemplary aspect of the authentication of payments and the determination of account balances for customer orders.

Once the customer placing the order (buyer or seller) is qualified, the data base management system searches portfo-

8

lios for the commoditized product being sold or purchased (FIG. 8). If the product is on hand (in the seller's portfolio), product is automatically delivered to the hub to settle outstanding trade. If not on hand, customer is given delivery instructions. Payment is issued to the seller through a payment routine such as one exemplified in FIG. 9.

If the product to be sold is not on hand, the seller can utilize several systems to send the product to the hub centric platform (FIG. 10). Any method of shipping can be utilized to ship the product to the platform, and payment can be issued once the product is received and authenticated. The product is then sent to the buyer. If the seller elects the prior pay method of shipping the product (FIG. 15), the hub centric platform system sends a payment to the seller. The payment acts as a contract that operates as a reverse hold on the funds in the payment. If the seller meets the conditions of the contract, for instance the product is received by the platform, and is authenticated, then the hold is removed and the funds are dispersed. This payment contract can be deposited in a financial institution as soon as it is received by the seller. Optionally, the shipping containers and prepaid shipping labels can be sent with the payment (FIG. 11).

The hub centric system also incorporates distribution routines. Product can be received and distributed through the platform, so that several orders can be combined from several sellers to provide only one shipment for the buyer. Conversely, several buy orders can be distributed from one sell order without requiring the seller to ship to several locations. All shipping of commoditized product goes through hub centric the platform. Package handling can be manual, or automated using various scales and mechanical devices known in the art. Shipping can be provided by shipping companies including but not limited to FedEx, UPS, Airborne, and the like. (FIGS. 12-14)

Whenever a customer elects to withdraw assets from their portfolio, there are several choices that can be made. If the customer wishes to be paid cash, a check or wire can be sent by means known in the art. If the customer chooses to take delivery of the commoditized products in the portfolio, a shipping method must be selected (FIG. 16). The data management system debits the commoditized products from the portfolio.

Once an order has been placed, and there is not a match to facilitate an execution, the order then resides in the market until it either matches, expires (if applicable), or is cancelled (FIG. 17)

When the customer sells product that is not in their portfolio, they are required to send product to the hub where product is then received (FIG. 18), qualified (FIG. 19), including but not limited to weighing, inspecting, verifying displacement, and any other means available to the industry.

Once incoming product is received and qualified, product is then posted to customer's account (FIG. 20). Payment can now be made to a customer for corresponding trade value without lien.

Although an illustrative example of the present invention and various aspects thereof have been described in detail herein with reference to the accompanying drawings, it is to be understood that the invention is not limited to this precise example and that various changes and further modifications may be effected therein by one skilled in the art without departing from the scope or spirit of the inventions as defined in the appended claims.

We claim:

1. A method for facilitating trading of a commoditized product comprising

electronically receiving at least one sell order from at least one seller to sell a commoditized product;

electronically receiving at least one buy order from at least one buyer to buy a commoditized product;

US 7,584,135 B1

9

10

electronically matching the at least one sell order with the
at least one buy order;

receiving commoditized product from the at least one
seller;

physically qualifying the commoditized product after it is
received from the at least one seller and before it is
distributed to the at least one buyer;

distributing a seller payment to the at least one seller;

receiving a buyer payment from the at least one buyer; and

distributing commoditized product to the at least one
buyer.

**2.** The method of claim **1** wherein the at least one buyer
comprises at least two buyers, and the at least one seller
comprises one seller.

**3.** The method of claim **1** wherein the at least one seller
comprises at least two sellers and the at least one buyer
comprises one buyer.

**4.** The method of claim **1** wherein distributing commod-
itized product to the at least one buyer comprises one or more
of accumulating the commoditized product in a portfolio
account for the at least one buyer, or shipping commoditized
product to the at least one buyer.

**5.** The method of claim **1** wherein distributing a seller
payment to the at least one seller comprises a prior pay ser-
vice.

**6.** The method of claim **5** wherein the prior pay service
comprises

sending a payment to the at least one seller, wherein the
payment is subject to a hold; and

releasing the hold on the payment when the commoditized
product is received from the at least one seller and physi-
cally qualified.

**7.** The method of claim **6**, wherein physically qualifying
the commoditized product received from the at least one
seller comprises determining whether the commoditized
product received from the at least one seller matches the at
least one sell order.

**8.** The method of claim **6**, wherein physically qualifying
the commoditized product received from the at least one
seller comprises

determining that the commoditized product received from
the at least one seller does not match the at least one sell
order;

temporarily maintaining the hold of funds on the payment
document;

notifying the at least one seller that the commoditized
product does not match the at least one sell order;

receiving from the at least one seller one or more of addi-
tional commoditized product, information, and/or
agreement to change the seller payment, such that the
commoditized product received from the at least one
seller is physically qualified.

**9.** The method of claim **1** wherein physically qualifying the
commoditized product received from the at least one seller
comprises authentication of commoditized product, inspec-
tion of commoditized product, verification of commoditized
product, or any combination thereof.

**10.** The method of claim **1**, wherein the commoditized
product comprises any product having a size, weight, color or
quality specification.

**11.** The method of claim **1**, wherein the commoditized
product comprises precious metal.

**12.** The method of claim **1** further comprising qualifying
the at least one buyer before matching the at least one sell
order with the at least one buy order.

**13.** The method of claim **12** wherein qualifying the at least
one buyer comprises any one or more of obtaining informa-
tion about the at least one buyer, verifying information pro-
vided by the at least one buyer, performing a credit check on
the at least one buyer, and/or receiving a payment from the at
least one buyer.

**14.** The method of claim **1** further comprising qualifying
the at least one seller before electronically matching the at
least one sell order with the at least one buy order.

**15.** The method of claim **14** wherein qualifying the at least
one seller comprises any one or more of obtaining informa-
tion about the at least one seller, verifying information pro-
vided by the at least one seller, performing a credit check on
the at least one seller, and/or receiving commoditized product
from the at least one seller.

**16.** The method of claim **1** wherein the at least one buy
order is not limited by the size, volume, or amount of com-
moditized product ordered.

**17.** The method of claim **1** wherein the at least one sell
order is not limited by the size, volume, or amount of com-
moditized product ordered.

**18.** The method of claim **1** wherein the at least one seller
and the at least one buyer remain anonymous to one another.

**19.** The method of claim **1** wherein the at least one seller
and the at least one buyer do not communicate.

**20.** The method of claim **1** wherein multiple buy orders can
fulfill one sell order.

**21.** The method of claim **1** wherein multiple sell orders can
fulfill one buy order.

**22.** The method of claim **1** additionally comprising provid-
ing real-time information regarding the market for the com-
moditized product.

**23.** The method of claim **1** wherein receiving commod-
itized product from the at least one seller comprises one or
more of physically receiving commoditized product, or draw-
ing commoditized product from at least one portfolio account
without regard to its physical location.

**24.** The method of claim **1** wherein distributing a seller
payment comprises one or more of distributing a payment
instrument to the seller, or adjusting a seller's customer
account.

**25.** The method of claim **1** wherein receiving a buyer
payment comprises one or more of receiving a payment
instrument, or adjusting a buyer's customer account.

**26.** A platform for facilitating trading a commoditized
product comprising

means for electronically receiving at least one sell order
from at least one seller to sell a commoditized product;

means for electronically receiving at least one buy order
from at least one buyer to buy a commoditized product;

means for electronically matching the at least one sell order
with the at least one buy order;

means for receiving commoditized product from the at
least one seller;

means for physically qualifying commoditized product
after it is received from the at least one seller and before
it is distributed to the at least one buyer;

means for receiving a buyer payment from the at least one
buyer;

means for distributing commoditized product to the at least
one buyer;

means for distributing a seller payment to the at least one
seller.

\* \* \* \* \*

# EXHIBIT B

Secured Patent Application Information Retrieval

AML Download    ● Order Certified Application As Filed  Order Certified File Wrapper  ▶ View Order List

| 09/860,134 | SYSTEM AND METHOD FOR ELECTRONIC TRADING AND DELIVERY OF A COMMODITIZED PRODUCT |

**Patent Term Adjustment**

| Filing or 371(c) Date: | 05-17-2001 | USPTO Delay (PTO) Delay (days): | - |
| Issue Date of Patent: | 09-01-2009 | Three Years: | - |
| Pre-Issue Petitions (days): | - | Applicant Delay (APPL) Delay (days): | - |
| Post-Issue Petitions (days): | - | Total Patent Term Adjustment (days): | 984 |
| USPTO Adjustment (days): | - | Explanation Of Calculators | |

**Patent Term Adjustment History**

| Date | Contents Description | PTO(Days) | APPL(Days) |
|---|---|---|---|
| 08-12-2009 | PTA 36 Months | 53 | |
| 09-01-2009 | Patent Issue Date Used in PTA Calculation | | |
| 08-06-2009 | Email Notification | ↟ | |
| 08-05-2009 | Dispatch to FDC | ↟ | |
| 08-03-2009 | Mail-Petition Decision - Dismissed | ↟ | |
| 07-31-2009 | Petition Decision - Dismissed | ↟ | |
| 05-21-2009 | Petition Entered | ↟ | |
| 05-22-2009 | Application Is Considered Ready for Issue | ↟ | |
| 05-21-2009 | Issue Fee Payment Verified | ↟ | |
| 05-21-2009 | Applicant Has Filed a Verified Statement of Small Entity Status in Compliance with 37 CFR 1.27 | ↟ | |
| 05-21-2009 | Issue Fee Payment Received | ↟ | |
| 04-21-2009 | Mail Response to 312 Amendment (PTO-271) | ↟ | |
| 04-20-2009 | Response to Amendment under Rule 312 | ↟ | |
| 04-20-2009 | Amendment after Notice of Allowance (Rule 312) | | 2 |
| 03-25-2009 | Mail Notice of drawing inconsistency with specification | | |
| 03-25-2009 | PUB Notice of drawing inconsistency with specification | | |
| 03-02-2009 | Mail Notice of Allowance | | |
| 03-01-2009 | Document Verification | | |
| 03-01-2009 | Notice of Allowance Data Verification Completed | | |
| 02-18-2009 | Date Forwarded to Examiner | | |
| 01-12-2009 | Response after Non-Final Action | | |
| 12-23-2008 | Mail Non-Final Rejection | | |
| 12-22-2008 | Non-Final Rejection | | |
| 10-30-2008 | Date Forwarded to Examiner | | |
| 10-30-2008 | Date Forwarded to Examiner | | |
| 10-14-2008 | Request for Continued Examination (RCE) | | |
| 10-30-2008 | Disposal for a RCE / CPA / R129 | | |
| 10-29-2008 | Document Verification | | |
| 10-14-2008 | Workflow - Request for RCE - Begin | | |
| 10-06-2008 | Case Docketed to Examiner in GAU | | |
| 10-06-2008 | Mail Final Rejection (PTOL - 326) | 7 | |
| 10-01-2008 | Final Rejection | ↟ | |
| 06-03-2008 | Date Forwarded to Examiner | ↟ | |
| 05-29-2008 | Amendment after Final Rejection | ↟ | |
| 04-15-2008 | Mail Final Rejection (PTOL - 326) | | |
| 04-14-2008 | Final Rejection | | |
| 01-28-2008 | Correspondence Address Change | | |
| 01-28-2008 | Date Forwarded to Examiner | | |
| 01-11-2008 | Response after Non-Final Action | | 49 |
| 01-11-2008 | Request for Extension of Time - Granted | | ↟ |
| 08-23-2007 | Mail Non-Final Rejection | | ↟ |
| 08-20-2007 | Non-Final Rejection | | |
| 06-07-2007 | Information Disclosure Statement considered | | |
| 06-07-2007 | Affidavit(s) (Rule 131 or 132) or Exhibit(s) Received | | |
| 06-07-2007 | Affidavit(s) (Rule 131 or 132) or Exhibit(s) Received | | |
| 06-11-2007 | Date Forwarded to Examiner | | |
| 06-11-2007 | Date Forwarded to Examiner | | |
| 06-07-2007 | Request for Continued Examination (RCE) | | |
| 06-11-2007 | Disposal for a RCE / CPA / R129 | | |
| 06-07-2007 | Request for Extension of Time - Granted | | |
| 06-07-2007 | Information Disclosure Statement (IDS) Filed | | |
| 06-07-2007 | Information Disclosure Statement (IDS) Filed | | |

| | | |
|---|---|---|
| 06-07-2007 | Workflow - Request for RCE - Begin | |
| 12-20-2006 | Mail Advisory Action (PTOL - 303) | |
| 12-14-2006 | Advisory Action (PTOL-303) | |
| 11-08-2006 | Letter Requesting Interview with Examiner | |
| 11-25-2006 | Date Forwarded to Examiner | |
| 11-08-2006 | Amendment/Argument after Notice of Appeal | |
| 11-08-2006 | Notice of Appeal Filed | |
| 10-05-2006 | Case Docketed to Examiner in GAU | |
| 09-08-2006 | Mail Final Rejection (PTOL - 326) | |
| 09-05-2006 | Final Rejection | |
| 06-20-2006 | Date Forwarded to Examiner | |
| 06-15-2006 | Response after Non-Final Action | 88 |
| 06-15-2006 | Request for Extension of Time - Granted | ✦ |
| 12-19-2005 | Mail Non-Final Rejection | ✦ |
| 12-12-2005 | Non-Final Rejection | |
| 09-16-2005 | Date Forwarded to Examiner | |
| 09-13-2005 | Response after Non-Final Action | |
| 05-14-2005 | Mail Non-Final Rejection | 1063 |
| 06-13-2005 | Non-Final Rejection | ✦ |
| 07-26-2004 | IFW TSS Processing by Tech Center Complete | ✦ |
| 09-20-2001 | Preliminary Amendment | ✦ |
| 05-17-2001 | Reference capture on IDS | ✦ |
| 05-17-2001 | Information Disclosure Statement (IDS) Filed | ✦ |
| 05-17-2001 | Information Disclosure Statement (IDS) Filed | ✦ |
| 09-15-2002 | Correspondence Address Change | ✦ |
| 09-16-2002 | Change in Power of Attorney (May Include Associate POA) | ✦ |
| 04-23-2002 | Case Docketed to Examiner in GAU | ✦ |
| 11-16-2001 | Case Docketed to Examiner in GAU | ✦ |
| 05-17-2001 | Miscellaneous Incoming Letter | ✦ |
| 11-01-2001 | Application Dispatched from OIPE | ✦ |
| 10-23-2001 | Application Is Now Complete | ✦ |
| 07-17-2001 | Correspondence Address Change | ✦ |
| 05-25-2001 | IFW Scan & PACR Auto Security Review | ✦ |
| 05-17-2001 | Initial Exam Team nn | ✦ |

*If you need help:*

- *Call the Patent Electronic Business Center at (866) 217-9197 (toll free) or e-mail EBC@uspto.gov for specific questions about Patent Application Information Retrieval (PAIR).*
- *Send general questions about USPTO programs to the USPTO Contact Center (UCC).*
- *If you experience technical difficulties or problems with this application, please report them via e-mail to Electronic Business Support or call 1 800-786-9199.*